**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **TINA COLAPIETRO,** | : | **3:08cv238(WWE)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DEPARTMENT OF MOTOR** | : | |
| **VEHICLES, and** | : | |
| **TIMOTHY KULISH,** | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM OF DECISION ON DEFENDANT DEPARTMENT OF MOTOR**
**VEHICLES'S MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff Tina Colapietro brings this action alleging discrimination by defendants Department of Motor Vehicles ("DMV") and Timothy Kulish, Manager of the DMV Emissions Division.  Specifically, plaintiff asserts that (1) defendant DMV violated Title VII; (2) defendant Kulish violated Connecticut General Statutes § 46a-60(a)(5); and (3) Kulish is liable for intentional infliction of emotional distress.  Both defendants have filed separate motions for summary judgment.

For the following reasons, DMV's motion for summary judgment is GRANTED in part and DENIED in part, and Kulish's motion for summary judgment is DENIED.

**BACKGROUND**

The parties have submitted statements of facts with supporting exhibits that reflect the following factual background.[1]

---

[1]This factual background reflects the submissions of defendant DMV and plaintiff because defendant Kulish has failed to file a statement of facts in compliance with Local Rule of Civil Procedure 56.

1

Plaintiff has been employed as an Emissions Agent at the DMV since 2000.  As an Emissions Agent, plaintiff was responsible for the inspection of various DMV emissions facilities across the state.

In 2004, the DMV opened the Emissions Tech Center in Cheshire, Connecticut, which serves as the central office for the field operations component of the Emissions Division.  The Cheshire facility is a secure building with security cameras inside and outside of the building.  Plaintiff was assigned to work at this facility after its 2004 opening.

Defendant Kulish served as the Emissions Division Manager at the Cheshire facility.   On January 9, 2004, Kulish received a three-day suspension as a result of a complaint against him concerning (1) his relationship with his secretary and another employee, Cherri Cedrone; (2) his misuse of state property; and (3) falsification of time sheets.

Plaintiff worked with three supervisors: (1) Cedrone, who was responsible for the video surveillance room that monitored independent garages performing emissions tests; (2) Michael DePaulo, who was in charge of making sure that the emissions testing equipment used at the testing locations functioned properly; and (3) William Mecca, who was in charge of coordinating covert operations by emissions agents checking on testing centers.  Cedrone and DePaulo had been promoted to supervisors in 2003.[2]

When plaintiff was assigned to inspect testing facilities, she traveled throughout

---

[2]Plaintiff claims that Cedrone was promoted because of her romantic liaison with Kulish.

the work day, except when she came into the office two mornings per week to pick up paperwork.  An assignment to perform covert inspections of testing sites required plaintiff to come to the Cheshire facility every day for an hour in the morning and a half hour at the end of the day.  If she was assigned to conduct video surveillance, plaintiff would monitor cameras in the surveillance room from 8:00 a.m. to 4:30 p.m., except when she left to eat lunch, attend to personal needs or discuss matters with other DMV employees or customers.  Plaintiff only met with Cedrone or Mecca when there was a question or when plaintiff needed copies.

Plaintiff received a "good" rating from Kulish on both her 2003 and 2004 performance reviews.  According to plaintiff, in 2005, Cedrone initially recommended an "unsatisfactory" performance rating for her, but Kulish changed that rating to "good" after plaintiff provided him with additional information about her work activities.  Plaintiff received a rating of "good" on her 2006 performance evaluation.

In her deposition, plaintiff averred that for, as far back as she could remember at the Cheshire facility, she observed Mecca's screen saver of a bikini-clad girl when she walked by Mecca's cubicle; if she wanted to talk to any of the four supervisors, she had to walk by that cubicle.  Plaintiff recalled that Mecca also called her out of the surveillance room to watch a skit on his office computer that plaintiff described as "sexually explicit, "disgusting" and "gross."

Plaintiff testified that DePaulo showed her a website that contained one joke called "Spank the Monkey."

Plaintiff did not report or file any complaint immediately after these incidents involving DePaulo or Mecca.  She attributes her failure to report misconduct to her fear

3

of retaliation.

Plaintiff averred that Doris Hernaiz, Kulish's secretary, "always" posted jokes and cartoons "of a sexual nature" and that she gave plaintiff a straw shaped like a penis. Plaintiff described the atmosphere as "expressly sexual," that it was "just all the time," and that it was hard to pinpoint exact dates of incidents.

In December 2005, a video allegedly containing racially offensive and sexist content was played at a DMV office party.  An anonymous party filed a complaint, prompting DMV's Affirmative Action Administrator Carmen Arroyo to commence an investigation.  Plaintiff and other employees cooperated with the investigation.[3]

In February 2006, plaintiff spoke with Affirmative Action Administrator Arroyo about sexually explicit materials in the work place.  On February 10, 2006, plaintiff filed a formal complaint about sexual harassment.  The complaint alleged that a "hostile environment" was fostered by defendants Kulish, Cedrone and DePaulo.

Plaintiff claims that, after February 10, 2006, Kulish placed her under surveillance within the Cheshire Emissions Tech Center.  Plaintiff claims that, "from the beginning" of her tenure at the Emissions Tech Center, she knew that Kulish had access to the surveillance cameras and was manipulating and controlling them from his office.  However, she was unaware that Kulish had been using the cameras to track her movements throughout the building until February 2007, at which time a police sergeant

---

[3]Plaintiff asserts that Kulish, Cedrone, Mecca, and DePaulo retaliated against her for cooperating with the investigation by monitoring her by video camera, shunning her, and giving her less desirable assignments.  Plaintiff also maintains that Bureau Chief Nappi harassed her in 2006 and 2007 regarding the investigation.

showed her video clips that he had seized from Kulish's office computer.

Plaintiff also claims that sometime during the year after February 10, 2006, Mecca followed her out to an emissions location on one occasion.

Also following her initial complaint in February 2006, plaintiff felt shunned by other employees within the DMV and was assigned to travel to different regions of the state to conduct covert operations.  Plaintiff believes that she was assigned by Cedrone and Kulish to travel farther than usual in retaliation for filing her complaint.

That same year, plaintiff applied for a Contract Compliance Officer position, which represented a promotion.  Thirteen individuals interviewed for the position and four were recommended for the promotion.  The interviewers, Harry Grough, Greg Kelly, and Peter Rosso, assessed plaintiff as technically weak and lacking "confidence in dealing with customers/stations."  Two other individuals who were not recommended for promotion were also noted as having weak technical skills.   In a letter dated November 22, 2006, plaintiff was informed that she was not selected for the position.

In November 2006, plaintiff took a medical leave of absence.

On January 8, 2007, Kulish was placed on paid administrative leave pending an investigation into alleged violations of the DMV work rules or policies.

On January 29, plaintiff filed a written complaint with the DMV asserting a hostile environment within the work place.

On February 2, plaintiff filed another written complaint describing defendant Kulish's video surveillance of her.

On February 7, Kulish was fired.

That same month, in response to her request for transfer, plaintiff was

5

reassigned to another facility where she opened mail.  When she returned to the Cheshire Emissions Tech Center, she was supervised by Henry Clough.

On April 12, 2007, plaintiff filed her charge of sexual harassment and retaliation with the Connecticut Commission of Human Rights and Opportunities ("CHRO").

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  American International Group, Inc., 664 F.2d at 351. In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson, 477 U.S. at 255.

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party

submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Anderson, 477 U.S. at 249.

DMV's Motion for Summary Judgment

Defendant DMV moves for summary judgment on the following grounds:  (1) expiration of the statute of limitations, (2) insufficient evidence that a hostile environment existed, and (3) the affirmative defense that plaintiff failed to avail herself of the sexual harassment reporting procedures in place at the DMV.  Defendant further asserts that plaintiff's retaliation claim must fail because she suffered no adverse action except the denial of a promotion, and she cannot establish a causal nexus between the denial of a promotion and her filing of a complaint.

Statute of Limitations: Hostile Work Environment

Defendant DMV argues that plaintiff's hostile environment claim is untimely because all of the alleged incidents occurred in 2004 and 2005.

A plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e-5(e)(1).  As defendant DMV points out, to set forth a timely claim, plaintiff was required to file her administrative charge with the CHRO within 300 days of the discriminatory act. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  Defendant bears the burden of proof on the affirmative defense that plaintiff's claim is barred by the statute of limitations.  McGullam v. Cedar Graphics, Inc., — F. 3d — , 2010 WL 2366026, *5 (2d Cir. 2010).

Hostile environment claims differ from claims based on discrete acts of discrimination because a hostile environment involves "repeated conduct" or the

7

"cumulative effect of individual acts" and the "unlawful employment practice therefore cannot be said to occur on any particular day." Morgan, 536 U.S. at 115. "Under Morgan, a sexually offensive incident within the limitations period permits consideration of an incident preceding the limitations period only if the incidents are sufficiently related." McGullam, — F.3d at —, 2010 WL 2366026 at *5. Thus, the entire period of the hostile environment may be considered so long as an act contributing to the hostile environment occurred within the statutory period. Morgan, 536 U.S. at 117; see also Crowley v. L.L. Bean, Inc., 303 F.3d 387, 406 (1st Cir. 2002). An act may be considered to be contributing to a hostile environment if an individualized assessment indicates that the incidents and episodes are related. McGullam, — F. 3d —, 2010 WL 2366026 at *5.

Plaintiff filed her administrative charge with the CHRO on April 12, 2007. Therefore, the limitations period started on June 16, 2006 (300 days prior to April 12, 2007).

DMV maintains that plaintiff's deposition testimony establishes that all of the alleged sexually-related offensive acts complained of in the CHRO complaint occurred in 2004 and 2005. DMV argues that Kulish's video surveillance of plaintiff is the only specific conduct included in the CHRO complaint that is beyond 2005, and that such conduct was not based on plaintiff's sex so as to constitute an act of sexual harassment that renders timely the prior conduct.

However, plaintiff's testimony indicates that an on-going sexually-charged atmosphere was "all the time" at the DMV, and that she felt "petrified" by Kulish's ability to manipulate the surveillance cameras to track employees' movements and

8

conversations within the building.  The evidence indicates that Kulish used the camera to follow plaintiff and zoom in upon her.  These alleged incidents appear to emanate from Kulish or those closely connected to him.  Construing the evidence most favorably to the non-moving party, there exists at least a question of fact as to whether a continuing sexually hostile environment existed, whether Kulish's conduct was based on plaintiff's sex, and whether it was related to the prior incidents or contributed to the alleged hostile environment.  The Court will deny summary judgment on the basis of the statute of limitations.

Prima Facie Case:  Hostile Work Environment

Defendant argues further that plaintiff's claim fails to meet the prima facie standard for hostile work environment.

A hostile work environment exists in violation of Title VII where the work environment is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  Harris v. Fork Lift Sys., Inc., 510 U.S. 17, 20 (1993).  To prevail on a hostile work environment claim, the plaintiff must show both (1) that her work environment was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the condition of her employment, and (2) that a specific basis exists for imputing to the employer the conduct that created the hostile environment.  Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996).  Relevant factors include (1) the frequency of the discriminatory conduct, (2) the severity of the conduct, (3) whether it is physically threatening or merely an offensive utterance, and (4) whether it unreasonably interferes with an employee's work performance.  Harris, 510 U.S. at

9

23.  "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility."  Leibovitz v. New York City Transit Auth. , 252 F.3d 179, 188 (2d Cir. 2001).

Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.  See Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).  However, one act that is sufficiently severe may alter the plaintiff's conditions of employment without repetition.  Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998), abrogated on other grounds by Morgan, 536 U.S. 101.  Of course, a plaintiff claiming a sex-based hostile work environment under Title VII must demonstrate that the alleged hostility occurred because of her sex.  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

Defendant DMV asserts that plaintiff's exposure to any of the alleged offensive conduct was limited because she spent most of her working days either traveling to different parts of the state or in the video surveillance room watching remote video cameras of emissions centers around the state.  Thus, defendant DMV argues that plaintiff cannot prevail because the "sporadic events that she described in her deposition did not permeate her work environment, nor did it materially prevent her from doing her job."  However, plaintiff was still required to spend some time in the offices of the Cheshire Emissions Tech Center to perform certain duties or to meet with her supervisors or other staff.  Whether the conduct that occurred was sufficient to alter her

work environment is a factual question to be determined by the trier of fact.  The Court
will deny the motion for summary judgment on this ground.

    <u>Affirmative Defense: Hostile Work Environment</u>

    Defendant raises the affirmative defense articulated in <u>Burlington Industries, Inc.</u>
<u>v. Ellerth</u>, 524 U.S. 742, 765 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775,
807 (1998).  An employer faced with vicarious liability for hostile environment where no
tangible employment action occurred may defend against liability by proving by a
preponderance of the evidence that (a) the employer exercised reasonable care to
prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff
employee unreasonably failed to take advantage of any preventive or corrective
opportunities provided by the employer or to avoid harm otherwise.  <u>Ellerth</u>, 524 U.S. at
765; <u>Faragher</u>, 524 U.S. at 807.

    A tangible employment action is "a significant change in employment status,
such as hiring, firing, failing to promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in benefits." <u>Ellerth</u>, 524
U.S. at 761. Plaintiff's brief does not appear to contend that a tangible employment
action is at issue.  The Court will assume for purposes of ruling on this motion that the
<u>Ellerth</u>/<u>Faragher</u> defense applies and will consider whether it mandates summary
judgment in defendant DMV's favor.

    Although not necessarily dispositive, the existence of an anti-harassment policy
with complaint procedures is important to the determination of whether the employer
has satisfied the first prong of this defense.  <u>Caridad v. Metro-North Commuter R.R.</u>,
191 F.3d 283, 295 (2d Cir. 1999).  It is undisputed that defendant DMV had a Sexual

Harassment Prevention Policy ("Policy") with a reporting procedure for complaints, and

that plaintiff was informed of the Policy when she was hired.   The Policy provided:

> Anyone who believes s/he has experienced sexual harassment, or has witnessed sexual harassment by any employee, vendor or any other person in connection with her/his employment, should bring the matter to the immediate attention of the Department of Motor Vehicles' Affirmative Action Program Manager, Carmen E. Arroyo . . . .  If the complainant prefers, s/he may report the matter directly to her/his supervisor.  If the complainant feels uncomfortable reporting the harassment to her/his supervisor, s/he should immediately report the matter to any other member of management.

The Policy provides further that each manager "is responsible for maintaining a work

environment free of sexual harassment" and for implementation of the Policy.   "A

supervisor or manager who receives a complaint about harassment, witnesses

harassment, becomes aware of or believes that someone is engaging in prohibited

conduct shall report it" to the Affirmative Action Program Manager.  The Policy states

that an investigation should be conducted in "as confidential a manner as possible . . . ."

As to the first prong, the evidence raises questions as to whether the DMV

exercised reasonable care in preventing sexual harassment.  Construing the evidence

most favorably to plaintiff, it appears that the supervisors and managers were well

aware of a sexually-charged atmosphere, even possibly perpetrating such environment,

but failed to take steps to remedy the situation as required by the Policy.  Even if the

Court assumes that defendant DMV has satisfied the first prong of the affirmative

defense, the Court will still deny summary judgment.

Despite her discomfort with the alleged sexually-charged environment

commencing in 2004, plaintiff did not complain to Arroyo until February 2006.  Although

defendant bears the ultimate burden of persuasion on both elements of the affirmative

defense, plaintiff bears a burden of production as to the reasons for her failure to avail

herself of the reporting procedures.  Leopold v. Baccarat, Inc., 239 F.3d 243, 246 (2d

Cir. 2001).  Here, plaintiff testified that she did complain to at least one supervisor,

Mecca, that his screen saver of a bikini-clad female offended her.  She maintains

further that she did not take any immediate steps to report that the sexually hostile

environment existed prior to February 2006 because employees knew that complaints

against Kulish, Cedrone, Mecca or DePaulo would result in retaliation.

An employee's concern for retaliation may only defeat the employer's affirmative

defense where it is based on a credible fear that reflects more than a subjective belief.

Id.  Here, the reasonableness of plaintiff's conduct represents a question of fact for the

trier of fact.  Summary judgment will be denied on defendant DMV's affirmative

defense.

Retaliation

Defendant DMV asserts that summary judgment should enter on plaintiff's

retaliation claim because plaintiff cannot establish any adverse action aside from the

denial of a promotion; she cannot prove a causal nexus between her failure to gain a

promotion and her protected activity; and an underlying nonretaliatory motivation exists

for the employment decision.

To establish a prima facie case of retaliation under Title VII, a plaintiff is required

to show by a preponderance of the evidence that: (1) she participated in a protected

activity, (2) the defendant knew of the protected activity; (3) she experienced an

adverse employment action; and (4) a causal connection exists between the protected

activity and the adverse employment action.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  Plaintiff's burden in satisfying the prima facie case is minimal.  Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1181 (2d Cir. 1996).

The McDonnell Douglas burden shifting analysis applies to retaliation claims brought pursuant to Title VII.  See Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).  Therefore, If plaintiff establishes a prima facie case, defendant must articulate a legitimate, non-discriminatory business reason for the alleged retaliatory action, and then plaintiff must prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

Materially Adverse

Defendant asserts that the actions that plaintiff complained about do not constitute adverse employment action pursuant to the standard of Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006), which requires that a materially adverse employment action is one that might dissuade a reasonable worker from making or supporting a charge of discrimination.  Burlington instructs that the significance of an alleged retaliatory act depends upon the particular circumstances and context of the workplace.  Not every action taken by an employer that is adverse to the employee is "materially adverse," and therefore, plaintiff must prove that the harm suffered was more than "mere inconvenience."  Byra-Grzegorczyk v. Bristol-Myers Squibb Co., 572 F. Supp. 2d 233, 252 (D. Conn. 2008).

The retaliatory actions alleged to be "materially adverse" include surveillance within the Cheshire facility, monitoring by a supervisor, diminished performance

14

evaluations, rotation throughout "far-flung" parts of the state, harassment and abuse by other DMV supervisors and employees, a demeaning assignment opening mail after transfer to another facility, and failure to be promoted to the Contract Compliance Officer position.  Defendant challenges as not materially adverse all of the above alleged actions with the exception of the failure to be promoted.

Generally, precedent within the Second Circuit has found that excessive scrutiny of an employee may cause an employee anxiety but it does not constitute a materially adverse action.  Deshpande v. Medisys Health Network, Inc., 2010 WL 1539745, *14 (E.D.N.Y. 2010); See also Reddy v. Salvation Army, 591 F. Supp. 2d 406, 427 (S.D.N.Y. 2008).  However, excessive scrutiny and reprimands accompanied by negative results such as a decrease in pay or being placed on probation may establish a materially adverse action.  Uddin v. City of New York, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006).

Defendant argues that the video surveillance and monitoring of plaintiff's work cannot be considered "materially adverse" because plaintiff understood that she could be monitored by cameras within the facility, her supervisor was authorized to verify her job performance, and she was not harmed by such surveillance.  Defendant points out that plaintiff was not aware of the video surveillance until after Kulish had been placed on administrative leave in February 2007.  Plaintiff has not shown any professional repercussion from the monitoring, and she did not know the extent of Kulish's surveillance although she felt she was being monitored.

However, the extent of Kulish's video surveillance coupled with Mecca's monitoring raises an inference that plaintiff was being singled out for excessive scrutiny

15

for a retaliatory purpose.  Defendant has not set forth any reason that such monitoring was necessary for any legitimate business reason.  In light of these exceptional circumstances, the Court finds that plaintiff has raised a question of fact as to whether the monitoring constitutes a materially adverse action in the context of retaliation.  See Dotson v. City of Syracuse, 2009 WL 2176127 (N.D.N.Y. 2009) (monitoring of plaintiff's phone conversation could be construed as materially adverse).

Plaintiff cites her diminished performance evaluations as retaliatory actions. Plaintiff contends that these evaluations contain increased criticism of her performance from prior years even if the actual performance rating did not change.  However, negative comments, without more, have not been held to constitute a materially adverse action.  Ragin v. East Ramapo Cent. School Dist., 2010 WL 1326779 (S.D.N.Y. 2010).  Plaintiff has not shown that the evaluations resulted in any adverse action or were in any way represented "materially adverse" action during her employment.

Plaintiff asserts that she was shunned and harassed by other employees in the DMV.  According to her deposition testimony, her co-workers and supervisors stopped speaking to her except, on occasions, as required for business.  However, Burlington explained that minor annoyances and snubbing by supervisors and co-workers' are not actionable as retaliatory actions.  548 U.S. at 68.  Similarly, Kulish's use of offensive words during meetings also constitutes an annoyance rather than a materially adverse action.  Plaintiff has not established that the content or context of Kulish's language retain any connotations specific to her.

16

Plaintiff asserts further that Bureau Chief Nappi harassed her by repeatedly calling to arrange to meet her in private to discuss the investigation into the complaint against Kulish.  A bureau chief's persistent phone calls to a subordinate employee could be construed as reasonably dissuading that employee from filing a complaint.  Accordingly, Nappi's conduct raises a factual issue as to whether it constitutes materially adverse action to be determined by the trier of fact.

Plaintiff's allegation that her travel assignments were affected may also meet the materially adverse standard in the context of retaliation.  This Court recognizes that much decisional law is reluctant to find an adverse action where a plaintiff is assigned work that is part of the employee's job.  See Martinez-Santiago v. Zurich North America Ins. Co., 2010 WL 184450 (S.D.N.Y. 2010) (citing cases).  Here, plaintiff's job may have encompassed assignments to far corners of the state.  However, the Court must consider the context of the alleged materially adverse action.  As Burlington observed, "one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the arduous duties and less time performing those that are easier or more agreeable."  548 U.S. at 71.  Obviously, an increase in road travel could prove sufficiently arduous that it would reasonably discourage an employee from filing a complaint.  The Court finds that genuine issues of material fact preclude summary judgment on the basis that her travel assignments cannot be considered materially adverse.  See O'Neill v. City of Bridgeport Police Dept., 2010 WL 2220579 (D. Conn. 2010) (denying summary judgment as to whether, inter alia, temporary assignment to night shift constituted alleged materially adverse action).

Similarly, although she suffered no demotion in pay or title, plaintiff's transfer assignment opening mail could be considered by a jury to satisfy the standard for materially adverse employment action.

Causal Connection

Accordingly, the Court must consider whether plaintiff can establish a causal connection between her protected activity and the alleged retaliatory conduct: The monitoring, Nappi's phone calls, the assignments to far reaching corners of the state, the transfer assignment opening mail and the failure to be promoted.

"The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus." Sumner v. U.S. Postal Serv. 899 F.2d 203, 209 (2d Cir. 1990). "While the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, the weight of authority supports the view that ten or twelve months is too long." Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 617 (S.D.N.Y. 2008).

Here, plaintiff filed her internal complaints in February 2006 and January and February 2007. Plaintiff is not specific as to when the video surveillance commenced or the date of Mecca's monitoring except that such conduct occurred after filing of her first complaint. There exists at least an inference that plaintiff was singled out for the monitoring, and defendant has offered no other explanation for the need to monitor

18

plaintiff's job performance except that it was within the purview of Kulish's and Mecca's authority.  Accordingly, there exists a genuine issue of fact as to whether these events occurred in response to plaintiff's complaints, and the Court will leave plaintiff to her proof that this conduct was animated by retaliation.

There is also a strong inference that Nappi's communication with plaintiff concerned plaintiff's complaints, and therefore, the Court will also deny summary judgment on this assertion of retaliatory action.

According to plaintiff, after February 2006, she was rotated to do inspections in the New Haven rather than Hartford area.  She has not specified any exact dates of these assignments nor has she demonstrated any inference that she was treated differently than other emissions agents.  In fact, her deposition testimony vitiates any inference that her inspections were assigned with a retaliatory animus.  She agreed that agents were rotated fairly and that the assignments balanced out over the year. Accordingly, plaintiff has failed to establish that a causal connection exists between her inspection assignments and her protected activity.  The Court will grant summary judgment in defendant's favor on this assertion of retaliation.

However, plaintiff's transfer assignment opening mail occurred in close temporal proximity to plaintiff's protected activity in early 2007.  Defendant has submitted no legitimate rationale for assigning plaintiff clerical work to satisfy her requested transfer. Accordingly, plaintiff is entitled to present this claim to the trier of fact.

Finally, the Court considers whether defendant DMV's failure to promote plaintiff to a Contract Compliance Officer position may represent a retaliatory act.  The denial occurred approximately nine months after plaintiff's February 2006 complaint.  Although

19

the temporal proximity between the two events is weak, the Court will assume for purposes of ruling on this motion that plaintiff has established the prima facie case.

Defendant submits as its legitimate, non-retaliatory reason that the committee of different managers, who had no connection to Kulish, Mecca, DePaulo or Cedrone, found that plaintiff did not interview as well as the other candidates recommended for the position.  An employer need not prove that it made the wisest choice but only that the reasons for the decision were nondiscriminatory.  Davis v. State Univ. of N.Y., 802 F.2d 638, 641 (2d Cir. 1986); see also Dister v. Cont'l Group, Inc., 859 F.2d 1108, 116 (2d Cir. 1988) (evidence that an employer made poor business judgment is insufficient to establish a genuine issue of fact as to pretext).  An employer's hiring decision may be based on the impression that an individual makes during an interview so long as its explanation of reasons are clear and specific to afford a plaintiff a fair opportunity to demonstrate pretext.  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 104-105 (2d Cir. 2001)

Plaintiff's brief does not attempt to undermine defendant's legitimate rationale as pretextual by demonstrating weaknesses, implausibilities or contradictions in the proffered rational.  See  Paladino v. DHL Express (USA), Inc., 2010 WL 1257786 (E.D.N.Y. 2010).   No evidence suggests that plaintiff was clearly superior to the other candidates or that anyone on the interviewing committee was even aware of her complaint in February 2006.  Accordingly, the Court will grant summary judgment on the allegation that the denial of the promotion to Contract Compliance Officer is retaliatory.

Defendant Kulish's Motion for Summary Judgment

Aiding and Abetting

Defendant Kulish maintains that he cannot be liable for aiding and abetting pursuant to Connecticut General Statutes § 46-60(a)(5) because he cannot be considered (1) an employer, (2) he did not aid and abet in the creation of a hostile environment to purposefully interfere with plaintiff's employment, and (3) he did not aid or abet in any retaliation.[4]

Pursuant to Connecticut General Statutes § 46-60(a)(5), an individual may be held liable for aiding and abetting his employer's discrimination.  Farrar v. Town of Stratford, 537 F. Supp. 2d 332, 356 (D. Conn. 2008).  Aiding and abetting requires that more than one actor be involved in the conduct contributing to the discrimination. Bolick v. Alea Group Holdings, LTD., 278 F. Supp. 2d 278, 282 (D. Conn. 2003) (application of CFEPA's aiding and abetting provision against a sole perpetrator would be illogical).  CFEPA's aiding and abetting provision encompasses any person who initiates, encourages or facilitates a discriminatory practice.  Murphy v. Robert Burgess & Norwalk Economic Opportunity Now, Inc., 1997 WL 529610, *5 (D. Conn. 1997).

In this case, plaintiff has adduced sufficient evidence that raises genuine issues of fact as to whether defendant Kulish initiated, encouraged or facilitated the discriminatory practices resulting in a sexually hostile environment and retaliation.

---

[4]Defendant Kulish also appears to argue that he cannot be held liable for failure to promote plaintiff rather than Cedrone.  However, plaintiff's briefs make clear that she asserts a sexually hostile environment claim.

Intentional Infliction of Emotional Distress

Kulish argues that he is entitled to summary judgment on the intentional infliction of emotional distress.

To prevail on her claim of intentional infliction of emotional  distress, plaintiff must establish: (1) that defendant Kulish intended to inflict emotional distress or knew or should have known that his conduct would likely result in emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct in question was the cause of plaintiff's distress; and (4) that the emotional distress experienced by plaintiff was severe.  Carrol v. Allstate Ins. Co., 262 Conn. 433, 443 (2003).

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!

Appleton v. Board of Educ. of Town of Southington, 254 Conn. 205, 210 (2000).  Here, the evidence raises questions of fact as to whether defendant Kulish's conduct meets this standard.  The Court will leave plaintiff to her proof.

## CONCLUSION

For the foregoing reasons, defendant DMV's motion for summary judgment [doc. #57] is GRANTED in part and DENIED in part.  Plaintiff may proceed against the DMV

on her claim of hostile environment and retaliation based on her assertions of

monitoring, Nappi's phone calls and transfer work assignment opening mail.

      Defendant's Kulish's motion for summary judgment [doc. #58] is DENIED.


           _____/s/_____
           Warren W. Eginton
           Senior United States District Judge


Dated at Bridgeport, Connecticut this _24__th day of June, 2010.